## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| **GENENE PROBST MILES,** | **MEMORANDUM DECISION AND ORDER** |
| **Plaintiff,** | |
| vs. | Case No. 2:19-cv-97-DAK-DBP |
| **DELTA AIR LINES, INC.,** | Judge Dale A. Kimball |
| **Defendant.** | Magistrate Judge Dustin B. Pead |

This matter is before the court on several pre-trial motions in limine: Plaintiff Genene Probst Miles' Motion in Limine to Exclude All Evidence, Argument and Special Verdict Reference Regarding Allocating Fault to Nonparty Strategic Aviation Services [ECF No. 65]; Defendant Delta Air Lines' Motion in Limine to Exclude Reference to Loss of Fringe Benefits [ECF No. 66]; Delta's Motion in Limine to Exclude Reference to Future Medical Expenses [ECF No. 67]; Delta's Motion in Limine to Exclude Lay Witness Testimony on Expert Topics [ECF No. 68]; and Miles' Motion in Limine Re: Delta's Admission That Its Agent Placed the Jet Way and Adapter Ramp on the Day of the Accident and That Its Admissions of Fault are Admissible [ECF No. 69]. The court held a hearing on the motions on August 3, 2023. At the hearing, E. Scott Savage represented Miles, and Andrew T. Stoker and Scott D. Sweeney represented Delta. The court took the matters under advisement. After carefully considering the parties' memoranda as well as the facts and law relevant to the pending motions, the court issues the following Memorandum Decision and Order on the pending motions.

## BACKGROUND

Plaintiff Genene Probst Miles, a Utah resident, was a flight attendant for Sky West Airlines based out of Seattle, Washington. Miles was injured while working as a crew member

on July 7, 2017, inside an aircraft at a Delta gate at the Vancouver, Canada airport.  It is undisputed that a Delta employee, Edgar "Alex" Barajas Pelayo, positioned the jetway at the gate.  Because he positioned the jetway higher than the floor of the passenger compartment of the aircraft and short of the aircraft door, he placed a "mobile bridge adapter" ramp between the end of the jetway and the aircraft door for onboarding passengers to use to board the aircraft. Because the jetway was positioned higher than the passenger compartment of the aircraft, the ramp sloped downward to the airplane.

Miles and another flight attendant saw the steep slope of the boarding ramp, but SkyWest does not allow its flight attendants to leave the airplane during boarding.  The flight attendants asked the flight's first officer to go up the jetway and get the gate agent to reposition the jetway so that the ramp would not be as steeply sloped.  Miles testified that the ramp was the steepest sloping ramp she had seen in her experience.  The flight's pilot also testified that the ramp had one of the steeper angles that he had ever seen.

Before that flight officer could get the gate agent to adjust the jet way and ramp, the flight attendants observed a 300-pound woman proceeding down the jetway using the type of cane that is used by blind people.  The passenger, Joan Case, was visually impaired and, unknown to the flight attendants, also deaf.  Case was traveling with her husband, but he was too far behind her to provide assistance.  She proceeded down the jetway without assistance and tried to exit the jetway at the door where gate-checked luggage is delivered.  As she turned toward the aircraft, the flight attendants, who were positioned inside the aircraft door, called out warnings to Case about the steep ramp, but she could not hear their warnings.

The ramp's steep slope caused Case to fall forward into the aircraft.  Miles held out her arms to break the woman's fall.  However, the force of the fall drove Case into Miles and Miles

was forced backwards into a service door or some other hard object in the galley area.  Miles next recalls people pulling Case off her.  Miles thought her arms were broken and her head was pounding like it was going to explode.  Miles believes that she briefly lost consciousness.  Miles is a petite woman but her effort to break Case's fall prevented any injury to Case.  Miles did not work on that flight because of her injuries.  She flew back to Seattle and then home to Utah.

Miles alleges that Delta's gate employees were negligent in positioning the jetway and in not assisting the blind and deaf passenger down the jetway when at least one of the gate agents knew that the ramp between the jetway and the aircraft was improperly and dangerously positioned.  Miles alleges that the accident resulted in both physical and psychological injuries, including post-traumatic stress disorder ("PTSD").  From the date of the accident through the end of 2019, Miles attempted to return to work as a flight attendant.  SkyWest accommodated her with duties that did not require her to fly, but this accommodation last for only a short period of time.  Miles attempted several times to work as a flight attendant but the anxiety and stress that this caused her made that work infrequent.  By the end of 2019, SkyWest requested that she either return to work full time as a flight attendant or take an early retirement.  Miles took an early retirement in early 2020.  Since the accident, Miles has had extensive therapy and trials of medications from numerous psychological and psychiatric providers. However, she has not been in therapy since 2000.

Initially, Miles sought lost wages for the difference between her 2016 earnings and her lesser earnings in 2017 through 2019, and future lost earnings based on her 2016 earnings.  Miles, however, sought employment that she could do with her disabilities, which led her to creating a partnership with a friend of hers who is a realtor.  Miles' psychological injuries restrict her ability to interact face-to-face with strangers (she even has difficulty going to a grocery

store), but she attends to all the administrative and research duties incidental to being a realtor. From 2020 to 2022, the partnership has provided Miles with a higher income than she received as a flight attendant. In 2016, Miles made $33,000 in an annual salary as a SkyWest flight attendant. In 2021, Miles made over $130,000 from her realtor partnership. Because of her increased earnings, Miles is no longer claiming lost future wages.

## DISCUSSION

The parties filed five pretrial motions in limine. The court will address them in the order in which they were filed.

### 1. **Miles' Motion in Limine to Exclude Any Reference to Allocating Fault to Non-Party**

Under Utah's Liability Reform Act ("ULRA"), Delta seeks to have the jury allocate fault for the accident to nonparty Strategic Aviation Services, LTD ("SAS"). Miles moves to preclude Delta from referencing SAS' potential fault on the grounds that there is no evidence to support allocating fault to SAS and, thus, any reference to SAS would be prejudicial to Miles.

Under the ULRA, a jury can only allocate fault to a nonparty "for whom there is a factual and legal basis to allocate fault." Utah Code § 78B-5-818(4)(a). To include a party or nonparty on a special verdict form, there must be "some evidence" that the party or nonparty "was at least in part at fault." *Kilpatrick v. Wiley*, 2001 UT 107, ¶ 61. For the "jury to apportion relative fault between two parties, the jury, of necessity, must have sufficient evidence of the culpability of each party to make that apportionment." *Egbert v. Nissan Motor Co.*, 2010 UT 8, ¶37. "Sufficient evidence is not pure speculation" but it also does not require "precise, specific evidence." *Id.*

Delta has a contract with SAS for SAS to provide passenger assistance services for Delta's passengers at the Vancouver airport where the accident occurred. However, Case was

4

not a Delta passenger.  She was a SkyWest passenger.  Also, significantly, Delta and SAS's contract states that SAS will provide services upon request.  There is no evidence that Case ever requested assistance.  SAS keeps records of passengers it assists, and Delta has not provided any evidence that SAS has record of assisting Case.

Delta claims that SAS's lack of evidence regarding Case could be evidence that SAS was at fault.  But that is pure speculation.  Delta has no evidence that Case requested assistance. Delta has not identified any SAS personnel in discovery.  The contract alone, that SAS will assist passengers upon request, is not enough to put SAS's role in the accident at issue.  Delta has to provide some factual basis that SAS was actually involved in this case.

Delta also relies on testimony from the aircraft's pilot that he thinks he saw a wheelchair at the top of the jetway.  But that testimony does not indicate that the wheelchair was Case's. Case did not have mobility issues.  She was walking down the jetway faster than her husband. The possible wheelchair at the top of the jet way also does not suggest that Case requested assistance from SAS.  The pilot did not know whether the wheelchair had been used to assist any of the passengers on the flight.  SAS cannot be added to the verdict form based only on speculation.

The court concludes that the jury cannot be asked to allocate fault to SAS because there is no evidence that SAS had a duty under the contract to assist Case, and Delta improperly asks a jury to speculate about SAS' alleged fault.  The court, therefore, grants Miles' Motion in Limine to Exclude All Evidence, Argument, and Special Verdict Reference Regarding Allocating Fault to Non-Party Strategic Aviation Services.

**2.  <u>Delta's Motion in Limine to Exclude Reference to Loss of Fringe Benefits</u>**

Delta seeks an order excluding any testimony and argument that Miles sustained damages

for loss of fringe benefits because she lacks documentary evidence or expert testimony to support these claims.  Miles seeks damages for: 1) loss of health, dental, and vision insurance; 2) quarterly bonuses; 3) travel benefits; 4) HAS contributions; 5) 401(k) employer contributions; 6) stock options; 7) vacation benefits; 8)user time benefits; and 9) holiday pay.

Delta served Miles with an interrogatory asking Miles to itemize each and every monetary loss or out-of-pocket expense.  Miles responded that she had no additional information to that which she included in her disclosures and she would provide additional information when she designated an expert.  Miles never designated an expert.  However, Miles provided supplemental disclosures.  In her last disclosures, she provided different bases for seeking fringe benefits, such as employer-paid health insurance, health savings account ("HSA") contributions, 401(k) contributions, as well as vacation, user time, and holiday pay.  Delta served iles a document request for copies of all computations and underlying data used in computing the claimed amount of wages, earnings, or income lost as a result of Delta's alleged conduct.  Miles' response to this document request referred Delta only to documents from the Washington State Department of Labor & Industries, itemizing medical bills paid for Miles' workers compensation claim.

In response to Delta's present motion in limine to exclude argument or testimony regarding Miles' purported loss of fringe benefits, Miles states that she is no longer claiming any projection of future lost fringe benefits because that would require an expert to reduce those numbers to present value and she has not engaged an expert to do that.  Miles also no longer seeks vision insurance because she never had employer contributions to vision insurance.  She also agrees that her quarterly bonuses are included in the computation of her lost wages, and she will make no separate claim for those amounts.  Miles further agrees that the lost value of her

stock options would require expert testimony and she will not claim a loss for stock options.

However, Miles is still seeking fringe benefits for the loss of employer-paid health and dental insurance premiums, employer contributions to an HSA and a 401(k), and employer-paid vacation, user time, and holiday from 2020 to mid-2023. Miles admits that these fringe benefits are already a part of her lost wages claim for the period of 2017-19, when she was still employed at SkyWest, and she has no grounds for seeking separate payment for them during that period. But she seeks payment of those fringe benefits for the time period after she left SkyWest to the present because no employer has been paying those benefits for her. However, she does not seek damages for future fringe benefits because she does not have an expert to support projections of them going forward.

Delta argues that these fringe benefits from 2020 to mid-2023 are still lost wages, as Miles admits they are for 2017 to 2019, and Miles cannot seek separate payment for these fringe benefits when she has agreed no to pursue lost wages from 2020 to mid-2023. Delta also argues that Miles has failed to present documentary evidence of these losses.

As an initial matter, the court must address Miles failure to supplement her discovery responses. Miles provided some bases for calculating her loss of fringe benefits in her Sixth Supplemental Initial Disclosures. For example, she stated in those disclosures that she believed the cost to replace her health insurance to be $500.00 per month. However, in response to Delta's Motion in Limine, Miles argues that she is seeking the amount of premiums SkyWest paid for her health insurance in 2016 for each of the years between 2020 to mid-2023. However, Miles has never provided Delta with supplemental responses to its discovery requests regarding her change in computation methods or evidentiary support for those calculation methods.

Miles argues that despite having Miles' calculations of damages for almost a year, Delta

has not sought a supplemental deposition, request any clarifications by interrogatories, or sought any additional documents.  But that is not how the discovery rules work.

Rule 26(e)(1) provides that "[a] party who has made a disclosure under Rule 26(a)—or who has responded to an interrogatory, request for production, or request for admission—must supplement or correct its disclosure or response: (A) in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."  Fed. R. Civ. P. 26(e)(1).  Under Rule 37(c)(1), "[i]f a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless."  *Id.* R. 37(c)(1).

Delta clearly asked Miles to itemize every monetary loss or out-of-pocket expense, and followed up with a request for copies of all computations and underlying data used in computing the claimed amount of wages, earnings, or income lost as a result of Delta's alleged conduct in this case.  Miles provided only documents related to workers compensation payments.  Miles had an obligation under the rules to supplement her responses to Delta's requests.  The fact that Miles' damages requests for fringe benefits continue to change even in response to the present motion in limine demonstrates that Miles has not supplemented her responses as required.  Accordingly, under Rule 37, Miles is precluded from using information or witnesses that she has not properly disclosed to Delta at trial.

1)  Loss of Employer Paid Premiums for Health and Dental Insurance

In Miles' last disclosures, she claimed that she lost her health and dental insurance provided by SkyWest after six months of her being unable to log enough hours and she believes

the cost to replace her health insurance is $500 per month, or $13,500 to date.  However, in response to Delta's motion in limine, Miles changed the way she is computing her loss of employer-paid health and dental insurance premiums.  She now frames the issue as having no employer to pay any portion of her premiums for health and dental insurance.  Miles new theory in response to Delta's motion in limine is that her damages can be computed by taking the amount SkyWest paid for health insurance during 2016—the last year she worked full time for SkyWest—which is $7,226.88, and applying it to the years since she retired from SkyWest in 2020.  Under this theory she now claims to have lost $7,226.88 in 2020-22, and half that amount in 2023 to date, for a total of $25,294.08.  She applies the same computations for dental insurance.  In 2016, SkyWest paid $485.52 for Miles' dental insurance so she is claiming the loss of dental insurance in the amount of $485.52 in 2020-22, and half that amount in 2023 to date—totaling $1,699.32.  By computing her loss in this way and not seeking it into the future, Miles contends that she does not require expert testimony to support the loss.

Miles may not need expert testimony for this new theory, however, she was required to supplement her discovery responses and provide Delta with the claimed loss and all the computations and underlying data used in computing the claimed loss.  Miles seems to argue that she is not responsible for providing underlying data to support this claimed loss.  But her ability to ask for losses of this benefit from 2020 to mid-2023 requires some underlying data.  Miles has not attempted to demonstrate that she has had to pay for her health and dental insurance during 2020 to 2023.  SkyWest never paid the yearly premiums directly to Miles.  Rather, SkyWest paid the yearly premiums to a health insurance company on Miles' behalf.  Miles now seeks that money directly paid to her because her current business does not pay for her health insurance premiums.  But Miles did not provide Delta with any documents relating to new health

insurance.  It is unknown whether Miles has health insurance, what the cost of that insurance is to Miles, and whether the insurance is equivalent insurance.  Miles' last disclosure to Delta stated that she "estimated" that health insurance would be $500 per month.  That indicates that she is not presently paying a certain premium per month.  If she was, she would know exactly what the cost was per month, and she should have provided that amount to Delta.  She did not submit any documentation supporting that estimate or basis for how she knows what insurance would cost and how she would be qualified to provide such an estimate.  All of that type of testimony would need some kind of documentary evidence.  Miles cannot testify that she has a feeling insurance would cost a certain amount per month.

Although her current theory seeks the amount SkyWest paid for her insurance in 2016, she has not demonstrated that the amount she seeks would be reimbursing her for part of new insurance that she has had to pay or whether she is paying anything for insurance.  For example, if Miles has equivalent insurance through other means, such as her husband's employer, at no cost to herself, her request for the premiums SkyWest paid per year would be to compensate her for no incurred loss.  She needs to have some documentation supporting a loss related to health insurance.  She cannot merely point to the amount Sky West paid for her premiums in 2016, without tying it to relevant present facts.  With no supporting documentation as to her present health insurance circumstances, Miles cannot establish the existence or amount of damages for the alleged loss of employer-paid insurance premiums.  She has similarly failed to provide any documentation regarding dental insurance, although she admits that she has not obtained dental insurance since leaving SkyWest.

Miles argues that she can testify as to these issues at trial, but she was required to provide the relevant computations and bases for the computations in response to Delta's discovery

requests. She failed to do so. Miles claims that Delta should have filed a motion to compel to receive the supporting documentation, but that puts the burden of her failure to comply with the rules on the other party. That is not how the discovery rules work. Miles does not seek an opportunity to provide evidence at this time. Had she requested an opportunity to provide such documents and agreed to allow Delta to depose her again prior to trial, the court could have entertained that request. However, Miles maintains that she can testify as to these matters without providing any supporting documentation. The court disagrees. She was required to respond to Delta's discovery request and supplement her responses. Her failure to do so does not allow her to surprise Delta with new bases for computing her alleged losses or presenting documentary evidence that should have been disclosed well before trial.

The court concludes that Miles must rely on some sort of documentary evidence regarding the cost of insurance to her from 2020 to mid-2023. She has not provided any of that information to Delta in discovery. Therefore, she cannot present any new evidence to establish this claim at trial. Without that evidence demonstrating loss, she cannot testify as to any claimed loss.

2) Travel Benefits

Miles seeks damages for her loss of free travel benefits, which she estimates to be $15,000. As an employee of SkyWest, Miles could fly at no cost on a stand-by basis anywhere that Delta or Alaska Airways flew. She could do this anytime she was off duty, and she had buddy passes for family. Prior to the accident, Miles claims that she loved flying to different cities and that was part of why being a flight attendant was her dream job. Miles was based out of Seattle and commuted regularly between Salt Lake and Seattle. She states that she will testify that she flew many places on her days off such as Nashville, New York, and Hawaii. She got

married two weeks before her accident, and she states that she and her husband intended to fly on her days off to different places whenever they could afford lodging.

Delta seeks to exclude evidence regarding this fringe benefit because Miles has not offered any evidence about how often she used the free travel benefits while she worked at SkyWest or how many flights she has had to pay for since she retired from SkyWest. Miles argues that she can ask the jury to assume that each flight would costs over $300 per flight because that estimate is conservative. But there is no basis for assuming what each flight would cost or a basis for establishing that $300 per flight is a conservative estimate. She needed to submit some documentation to support her claim for this estimate. For purposes of establishing a lost fringe benefit as part of her earnings, Miles did not disclose a basis for or evidence supporting this type of damage in her responses to discovery requests.

The court agrees, however, that this lost benefit could be part of Miles' general damages to the extent that she is claiming that being a flight attendant was her dream job and that she lost that dream job as a result of the accident. Also, prior to the accident, Miles loved flying and going different places. Since the accident, she is now anxious and uncomfortable when she is in an airplane, she has completely lost that aspect of joy in her life. Delta, however, can counter this type of testimony with evidence that she has a new job that pays her significantly more money, she has no need to commute to another town with her new job, and the additional money she makes could pay for a lot of free travel, and other such arguments.

3)   Employer-paid HSA & 401(k) Contributions, Vacation, User Time, & Holiday Pay

Miles claims that she had the benefit of an employer paying into an HSA and a 401(k) account as well as employer-paid vacation days, user time leave, and holidays until 2019, but has not had that benefit since she left SkyWest in 2020. She recognizes that all these employer-paid

benefits are part of her lost wage claim from 2017 to 2019.  But she seeks them as lost benefits from 2020 to mid-2023, when she worked as a realtor.  She states that SkyWest payroll records indicate that SkyWest would contribute $1000 a year into an HSA for her, $390.27 per year into a 401(k), $1,456.08 in yearly paid vacation days, $447.93 in yearly user time leave, and $483.09 in yearly holiday pay, based on the amount Sky West contributed in 2016, for a total yearly employer-paid benefits of $3,777.37.  Therefore, from 2020 to mid-2023, she seeks $3500 in HAS contributions, $1,365.94 in 401(k) contributions, $4,861.89 in vacation pay, $1,484.85 in user time leave, and $1,478.40 in holiday pay, for a total of employer-paid benefits of $12,691.08.

Miles claims that she is able to testify as to each of these benefits and she does not need to provide any kind of evidence that she does not receive this kind of compensation in her new employment.  Her argument appears to be that it is essentially self-evident that self-employed realtors do not receive these types of benefits and that no amount of other compensation can take their place.  However, she fails to offer any evidence to support the notion that there is some intangible value to these economic benefits being paid by an employer as opposed to paying for them yourself out of your own compensation.  She made $130,000 in 2021 in her realtor partnership compared to $33,000 in 2016 in her position with SkyWest.  Yearly employer-paid benefits of $3,777.37 is a tiny fraction of the additional $97,000 in compensation she earned in 2021.

Miles provides no legal support for her assertion that lost economic fringe benefits of this type are not lost earnings.  She is seeking these benefits as compensatory damages, but she has not provided any evidence that she has suffered an economic loss from 2020 to mid-2023.  She admits that these benefits are part of her lost wages from 2017-2019, she has a cash-equivalent

value for each of these benefits, and they are clearly economic benefits that were part of her SkyWest compensation package  But after she left SkyWest, Miles claims that these benefits were no longer wages or earnings that could be compared to her current earnings.  Miles cannot argue that her present claim for payment of fringe benefits for the years since she left SkyWest is simply intuitive and this novel theory did not need to be disclosed and documented. .  She should have previously disclosed that her fringe benefits that were part of her lost wages claim from 2017-19 were not a part of her lost wages claim from 2020 to mid-2023.

Miles' current claim for the loss of these fringe benefits is based on the fact that she does not receive these types of benefits from her present employer.  However, she has created a realtor partnership with a friend and is essentially her own employer.  She has decided not to pay herself these fringe benefits out of her earnings.  If Miles was making a similar annual salary to what she made at SkyWest in 2016, she could possibly argue that she does not make enough money to pay herself those benefits.  But she made $33,000 in her last full year with SkyWest, and she made $130,000 in 2021 as a realtor.  Adding every fringe benefit she seeks to her $33,000 salary from SkyWest takes her pay up to approximately $37,000, which does not approach her current $130,000 annual salary.  She has not presented any evidence that would show that her partnership is incapable of paying her similar fringe benefits.  She also provides no explanation for why she does not pay herself these benefits.  Miles, therefore, is seeking economic fringe benefits for 2020 to mid-2023, when her earnings far exceed what she earned through wages and fringe benefits at the time of the accident.  Lost economic fringe benefits are a part of your lost earnings, and Miles has not demonstrated any such losses from 2020 to mid-2023 for which she needs to be compensated.

By forgoing an economics expert, Miles appears to be trying to testify to novel theories to

which an economics expert would not be allowed to testify. Based on the evidence before the court, the court would not allow an economics expert to testify that Miles suffered an economic loss as a result of the loss of these fringe benefits during 2020 to mid-2023. Similarly, Miles cannot testify that there was a loss.

These lost economic fringe benefits were part of Miles' compensation at SkyWest and they must be compared to her compensation at her present employment. Because there is no evidence that Miles suffered an economic loss during from 2020 to mid-2023, Miles cannot testify that she suffered a loss as a result of these fringe benefits not being paid by an employer.

### 3. Delta's Motion in Limine to Exclude Reference to Future Medical Expenses

Delta argues that the court should exclude any testimony that Miles will incur future medical expenses because expert testimony is required to establish this type of damage. Delta claims that Miles has not disclosed an expert to opine on the necessity or expense of future medical treatment, but her supplemental disclosures include an itemization of damages stating that she anticipates $10,000 in future psychological/psychiatric therapy. Miles has disclosed a treating psychologist and an expert psychologist. Miles disclosed Dr. Steven McCowin, one of her treating psychologists, as an expert witness, and Delta deposed him.

Delta asserts that Miles' disclosures made no reference to McCowin opining that Miles would require future medical care, nor the nature and cost of any such treatments. Miles' disclosure states that McCowin will testify consistent with his records previously produced and his deposition testimony. During his deposition, Delta asked McCowin questions about Miles' need for future treatments. In her Sixth Supplemental Initial Disclosures, Miles estimated future treatment from McCowin to be $10,000 based on McCowin's hourly rate and how many sessions Miles estimates it would take her to reach a maximum benefit given that he opined that she had a

complicated case of PTSD.

Rule 26(a)(2)(C), applies to expert witnesses who are not required to prepare a written report.  A party must prepare an expert disclosure for the non-retained expert, setting forth "the subject matter on which the witness is expected to present evidence" and "a summary of the facts and opinions to which the witness is expected to testify."  Miles served a barebones disclosure merely referring to McCowin's records and deposition.  The disclosure itself does not mention that McCowin will opine on Miles' future medical expenses.  Moreover, Miles did not discuss the cost of future treatment in his deposition.  Miles' estimate for future medical expenses was prepared by counsel after he asked McCowin about his hourly rate.

Miles now blames Delta for failing to extract testimony from McCowin on future medical expenses, stating that it was incumbent on Delta's counsel to ask how many hours of therapy McCowin thinks would bring Miles to maximum medical improvement and his hourly rate.  This argument attempts to blame Delta for the shortcomings in Miles' expert disclosures.  Miles' disclosures should have identified future medical expenses as a subject matter of McCowin's testimony.  However, given that the issue was discussed in the deposition, the court does not see how Delta is prejudiced by allowing the testimony at trial.  Delta can cross examine McCowin on the need for future medical treatment, why treatment stopped, how long it has been since he treated Miles, whether he previously prescribed future treatment, the existence of documents demonstrating any prescription for future treatment, whether prior treatments were approved and paid by workers compensation, and whether he knows if workers compensation has approved or denied future treatments.  Delta can also seek answers as to these issues while cross-examining Miles as she may be the only witness who knows why she has not sought treatment for three years.  Although McCowin testified that he thought future treatment would help Miles, rather

than testifying that she needs future treatment, that does not preclude his testimony altogether. Delta can cross examine him about that difference.   The court, therefore, concludes that Delta can deal with the inadequacies of Miles' disclosures through cross examination of McCowin and Miles.

### 4. Delta's Motion in Limine to Exclude Lay Witness Testimony on Expert Topics and Miles' Motion in Limine Re: Delta's Admission that its Agent Placed the Jetway and Adapter Ramp on the Day of the Accident and That Its Admissions of Fault Are Admissible.

Delta argues that the court should exclude testimony from any witnesses claiming that Delta violated the applicable standard of care or that the angle of the ramp caused Miles' injuries because these are both topics for expert testimony and no experts have been disclosed on these topics.  Delta claims that these topics are outside the understanding of a lay person and it would be speculative for a lay witness to offer opinions on these topics.

Utah courts have held that expert testimony is required "if the standard of care involves issues that do not fall within the common knowledge and experience of lay jurors." *Callister v. Snowbird Corp.*, 2014 UT App 243, 337 P.3d 1044, 1050.  While "this principle is most clearly demonstrated in medical malpractice cases, it is not limited to that context.  Rather, its application depends upon the facts and circumstances of the individual case and may properly be applied in other, non-medical malpractice negligence cases." *Id.* at 1049.  In negligence cases against defendants in industries with "specialized equipment and operations, expert testimony is required because an average person would not have knowledge of standard of care in those industries and thus would be forced to speculate" about how a reasonable defendant would act. *Id.* at 1050 (cleaned up).  This requirement to submit expert testimony to establish the standard of care has been applied to trip and fall cases involving various walking surfaces, including curbs and stairs. *See, e.g., Spafford v. Granit Credit Union*, 2011 UT App 401, ¶ 26; *Fox v. Brigham*

*Young Univ.*, 2007 UT App 406, ¶ 11, 176 P.3d 446, 449.

Miles and the Flight Captain are experienced airline personnel, and both have testified that the ramp placed that day was one of the steepest they have ever seen a ramp placed. Captain Frank will also testify that the Delta gate agent who positioned the jetway and the ramp told him, "Oh, I have that way too high.  That's my fault."  Delta does not offer valid reasons for the exclusion of  lay witness testimony regarding observations of, and concerns and statements about, the steep angle of the ramp.  This is testimony of personal observations and statements made at the time the ramp was being observed, and not technical/scientific opinion testimony.  It is admissible under FRE 601, 602, and 701.  The testimony is rationally based on the witnesses' perceptions, not specialized knowledge.

Contrary to Delta's theory of the motion, this layperson testimony regarding observations of and concerns about the steep angle of the ramp is not an improper substitute for required expert testimony.  Instead, it is sufficient for the issue of negligence to be submitted to the jury. Expert testimony is necessary where the jury would be unable to determine the applicable standard of care without resorting to speculation.  In this case, the jury can decide whether the positioning of the ramp was unreasonably dangerous to the general public based on Miles' and Captain Frank's testimony that adaptor ramps are typically level and that the gate agent told Captain Frank that he had the ramp way too high.  The particulars of whether the ramp was unreasonably dangerous is within the common knowledge and experience of a lay juror.  A lay juror knows that airline passengers come in all kinds of different states and the ramp is usually flat because it needs to be safe for all of them.

In addition, Miles argues that it is unclear if Delta limits its motion to causation for the occurrence of the accident or causation of Miles' claimed injuries.  Part of the motion is clearly

directed at the issue regarding the cause of Case's fall.  Miles intends to use her own testimony regarding her observations of the fall to establish the fact that the steep downward angle of the ramp caused Case to lose her balance and fall.  That is what Miles witnessed.  Lay witness testimony by persons who observed a fall that a specific physical condition caused is admissible under FRE 602 and 701, and is not an improper substitute for required expert testimony. Expert testimony is not needed to prove causation where causation is obvious.

Delta's motion only argues that expert witness testimony is required to establish that it was the angle of the ramp and not Case's blindness that caused the accident.  Accordingly, the only lay person testimony on causation that the motion seeks to exclude is testimony that it was the ramp angle and not Case's blindness that caused her to fall.  However, this is, in effect, claiming that Case was potentially a cause of the accident because of her blindness.  Delta has not served any notice to have fault attributable to Case because of her blindness. While the fall might not have happened if Case was not blind, her blindness is not something that can make her at fault for the accident.  Delta provides public access and some members of the public are blind. Case's blindness was a reasonably foreseeable condition of a boarding passenger.  There is no alternate cause of the accident.

There is no dispute that Case's fall into Miles caused injury to Miles.  There is no dispute that Case was a large woman and Miles tried to protect her from her fall.  The only dispute requiring expert testimony regarding causation is the extent of Miles' injury due to the accident. Contrary to the motion's assertion that Miles will not have any expert witness testimony regarding causation, Miles has designated numerous treating physicians and other medical personnel and a forensic psychologist, who have all testified and will testify at trial that Case's fall into Miles caused the condition for which they treated Miles.  Underlying all of this expert

testimony is the fact that this was an on-the-job injury and all of the treatment had to be authorized by the applicable workers compensation entity as treatment for this accident.  The motion cannot exclude any of the causation testimony from her expert as to what injuries she received from Case's fall.

With respect to Miles' motion, Delta admits that it cannot claim, argue, or suggest that it was not a Delta agent that placed the jet way and ramp for the flight at issue.  Delta admitted this in an answer to Miles' Interrogatories.

Delta, however, opposes Miles' motion about the admissibility of the gate agent's admission of fault.  Delta claims that the admissions of fault that the gate agent made to the pilot, Captain Frank, are hearsay.  Captain Frank testified in his deposition that after he became aware of the fall, he went up to the customer service agent.  Frank recalled that the ramp was at a steeper angle than normal, one of the steeper angles that he had ever seen.  Frank went and found the gate agent and he came down with him.  Frank testified that the gate agent said "Oh, I have that way too high,  That's my fault."  Frank said that the gate agent mentioned that several times during their conversation.  The gate agent then repositioned the ramp to a less steep angle before the rest of the boarding happened.

The statements are not hearsay under FRE 801(d)(2)(A) and (D).  Delta admitted it was its gate agent who positioned the jetway and ramp for the flight.  There is no evidence that Frank was talking to anyone other than Delta's employee who positioned the ramp.  Delta has no evidence that someone other than its agent positioned the jetway and ramp or that it was someone else who spoke to Frank.  These statements are offered against Delta, an opposing party, and they were made by Delta's agent or employee in his representative capacity, and they were on a matter within the scope of the gate agent's employment.

20

Even if the statements were hearsay, they fall within exceptions to the hearsay rule under FRE 803 and 804. The gate agent's statements that he had that way too high and that it was his fault describe an event or condition and was made contemporaneous to the observation.  Fed. R. Evid. 803(1).  The statements are present sense impressions.  They are also statements of the gate agent's then-existing state of mind under FRE 803(3).  The statements were not a memory or belief.

The statement is also admissible under FRE 804(b)(3) because the gate agent is unavailable to testify at trial and it is a statement against interest.  The gate agent lives outside of Utah, as he is an employee based at the Vancouver, Canada airport.  A reasonable person in the declarant's position would have made the statement only if the person believed the statement to be true because, when made, the statement clearly was contrary to declarant's interests and exposed him to civil liability.  The statement is also supported by corroborating circumstances that indicate its trustworthiness.  The statements are not hearsay or are an exception to the hearsay rule and are admissible.

## CONCLUSION

Based on the above reasoning, Plaintiff Genene Probst Miles' Motion in Limine to Exclude All Evidence, Argument and Special Verdict Reference Regarding Allocating Fault to Nonparty Strategic Aviation Services [ECF No. 65] is GRANTED; Defendant Delta Air Lines' Motion in Limine to Exclude Reference to Loss of Fringe Benefits [ECF No. 66] is GRANTED IN PART AND DENIED IN PART as discussed above; Delta's Motion in Limine to Exclude Reference to Future Medical Expenses [ECF No. 67] is DENIED; Delta's Motion in Limine to Exclude Lay Witness Testimony on Expert Topics [ECF No. 68] is DENIED; and Miles' Motion in Limine Re: Delta's Admission That Its Agent Placed the Jet Way and Adapter Ramp on the

Day of the Accident and That Its Admissions of Fault are Admissible [ECF No. 69] is

GRANTED.

DATED this 11th day of August, 2023.

BY THE COURT

DALE A. KIMBALL
United States District Judge